UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

RICHARD A. FOX,                )
                                       )
                Plaintiff,      )
                                       )
           v.              )      No. 2:18-cv-00237-JPH-MJD
                                       )
J. WEST-DENNING, *et al.*       )
                                     )
               Defendants.   )

**ENTRY GRANTING IN PART AND DENYING IN PART
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Richard A. Fox brought this civil rights action under 42 U.S.C. § 1983. He alleges that the defendants violated his constitutional rights while he was incarcerated at Wabash Valley Correctional Facility ("WVCF"). The Complaint sets forth Eighth Amendment deliberate indifference claims against all defendants and  First Amendment retaliation claims against Dr. Jackie West-Denning and Health Services Administrator Kim Hobson. *See* dkts. 8, 27.[1] Mr. Fox alleges that the defendants were deliberately indifferent to his severe back pain and that Dr. West-Denning and Hobson retaliated against him for filing grievances.

---

[1] On January 18, 2019, the Court gave Mr. Fox until February 15, 2019, to file an amended complaint, but he failed to do so. *See* dkt. 53. Thus, the case proceeds on the claims allowed by the Court's orders of June 3, 2018, dkt. 8, and September 11, 2018, dkt. 27.

The defendants moved for summary judgment, dkts. 75–77, Mr. Fox responded,[2] dkts. 82–83, and the defendants replied, dkt. 84.[3] For the reasons stated below, Dr. West-Denning is not entitled to summary judgment as to Mr. Fox's deliberate indifference claim, but the defendants are entitled to summary judgment as to Mr. Fox's other claims.

## I.    Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016).

To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477

---

[2] To the extent Mr. Fox seeks summary judgment in his favor, *e.g.*, dkt. 82 at 1, 20, such request is inappropriate because motions "must not be contained within a brief, response, or reply to a previously filed motion, unless ordered by the court." S.D. Ind. Local Rule 7-1(a). Regardless, there are genuine issues of material fact as to his Eighth Amendment claim against Dr. West-Denning, preventing the entry of summary judgment in his favor on that claim.  And the defendants are entitled to summary judgment on the remaining claims.

[3] Mr. Fox also filed two surreplies, Dkts. 85, 88, and a duplicate copy of his affidavit in opposition to the motion for summary judgment, Dkt. 86. The duplicate copy of the affidavit was unnecessary. The surreplies were not authorized because the defendants did not cite new evidence in their reply or object to the admissibility of the evidence cited in Mr. Fox's response. *See* S.D. Ind. Local Rule 56-1(d) ("A party opposing summary judgment may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response."). The second surreply was also unauthorized because it was untimely. *See id.* ("The surreply must be filed within 7 days after the movant serves the reply[.]"). The Court does not consider the unauthorized surreplies with respect to Mr. Fox's Eighth Amendment deliberate indifference claim against Dr. West-Denning. As explained below, that claim survives summary judgment even when the surreplies are not considered. Although the Court is not obligated to consider the unauthorized surreplies with respect to Mr. Fox's other claims, it has done so in an abundance of caution. As explained below, Mr. Fox's other claims do not survive summary judgment even when the surreplies are considered.

U.S. 317, 324 (1986). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

An affidavit used as support must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Statements that "fall outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or [are] merely conclusory do not meet this requirement." *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572–73 (7th Cir. 2017).

Finally, although *pro se* filings are construed liberally, *pro se* litigants are not exempt from procedural rules. *See Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (noting that "*pro se* litigants are not excused from compliance with procedural rules"); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced").

## II.      Background

The defendants provide a statement of undisputed material facts. Dkt. 76 at 3–8. In his response brief and surreplies, Mr. Fox identifies several facts that he contends are disputed. *See* dkts. 82, 85, 88. The Court will highlight the disputed facts (to the extent they are supported by admissible evidence) in this section and analyze the impact of those disputed facts in its discussion of the defendants' motion for summary judgment.

### A.      Relevant Medical History

Mr. Fox is incarcerated at WVCF. His medical records show that he was diagnosed with lumbar spondylosis with myelopathy[4] in August 2007. *See, e.g.*, dkt. 77-4 at 2; dkt. 83-1 at 13. At various times before Dr. West-Denning treated Mr. Fox, other prison doctors prescribed the drug Neurontin for the condition. *See* dkt. 77-9 at 5 (showing Neurontin prescriptions from December 2008 to November 2009 and from September 2015 to February 2018). For example, in 2016, Dr. Samuel Byrd completed forms requesting Neurontin for Mr. Fox even though it was a non-formulary drug. *See, e.g.*, dkt. 83-1 at 16–18. He noted that a 2010 X-ray showed a "pars defect at L5/S1 with mild spondylolisthesis of L5 on S1" that produces "apparent B foraminal narrowing." Dkt. 83-1 at 16. He reported that Mr. Fox's primary complaint is "low back pain with associated [left] buttocks pain that radiates down [the left] leg to top of [the left] foot" and that "[p]ain is present daily and > 5/10 most days." *Id.* He noted that Mr. Fox had failed non-steroidal anti-inflammatory medications ("NSAIDs"), Pamelor, and Tegretol in the past for pain relief. *Id.* He stated, "Exam findings have been rema[r]kable for about 25% reduction in [range of motion] globally. No spasms. Tenderness over [lumbosacral] spine at L3-S1 . . . . Patient with diminished

---

[4] Spondylosis with myelopathy describes degenerative changes in the spine that damage the spinal cord. *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/myelopathy (last visited Sept. 21, 2020).

but present vibratory sensation of [left] quadriceps, calf, anterior ankle and MTP joint regions." *Id.* In August 2017, Dr. Byrd requested a renewal of Neurontin because Mr. Fox's condition was relatively stable with Neurontin making the pain manageable. *Id.* at 19. Mr. Fox's medical records show that Neurontin was again ordered on November 8, 2017, with a "stop date" of February 5, 2018. Dkt. 77-9 at 5.

Mr. Fox's medical records also show that prison health care providers provided him with Naprosyn (also known as naproxen) and aspirin multiple times during his incarceration. *See* dkt. 77-9 at 5–6 (showing Naprosyn orders from October 2008 to December 2008, from March 2009 to June 2009, from November 2010 to October 2011, and from January 2013 to June 2014), 7 (showing low-dose aspirin orders from July 2016 to March 2019), 12 (showing aspirin orders from September 2010 to July 2016). Mr. Fox contends he is allergic to all anti-inflammatory medications, including Naprosyn, dkt. 77-24 at 93, 104, 105[5], but his medical records list only an allergy to ibuprofen, *see, e.g.*, dkt. 77-3 at 2; dkt. 77-4 at 2; dkt. 77-10 at 2; dkt. 77-24 at 107 (agreeing that the records list only an allergy to ibuprofen).

## B.    Interactions with Dr. West-Denning

Dr. West-Denning is a physician licensed to practice medicine in the State of Indiana. Dkt. 77-1 ¶ 1. She began working at WVCF as a physician on October 23, 2017. *Id.* ¶ 2. Her employer was Wexford of Indiana, LLC. *Id.* She is approximately 4'11" tall and weighed approximately 98 pounds during her time at WVCF. *Id.* ¶ 3.

Dr. West-Denning was first scheduled to see Mr. Fox on December 15, 2017, for his monthly diabetes visit, but Mr. Fox refused to attend the visit. *Id.* ¶ 7; *see also* dkt. 77-2. She first

---

[5] Citations to Mr. Fox's deposition are to the original transcript page numbers, not the page numbers "stamped" on the document when it was filed in CM/ECF.

saw and treated Mr. Fox on January 22, 2018, during his monthly diabetes visit. Dkt. 77-1 ¶ 8; dkt.

77-3. During the January visit, Dr. West-Denning conducted an examination tailored to Mr. Fox's

diabetes; she also added a blood-pressure medication. *Id.*; *see also* dkt. 77-9 at 13.

Mr. Fox's prescription for Neurontin expired on February 5, 2018. Dkt. 77-8 at 5. On

February 6, 2018, he completed a "Request for Health Care" form that read:

> I was informed by the AM nurse that my pain meds stop[.] All my chronic care
> medications was suppose to been reorder last month[.] I suffer severe chronic pains
> daily . . . [.] I have not got my medication at day or nite for two 2 days[.] Also I was
> told I didn[']t not have a chronic condition[.] Yes I do[.] I need my pain medication
> urgently[.] Can't sleep[.]

Dkt. 1-1 at 17. On February 8, 2018, a certified medical assistant[6] responded to the form, writing,

"Scheduled w/MDSC." *Id.*

Mr. Fox was scheduled to see Dr. West-Denning on February 12, 2018. *See* dkt. 77-4. At

the time of the appointment, Mr. Fox was 6'2" tall and weighed well over 250 pounds. *Id.* at 2; *see*

*also* dkt. 77-24 at 77. The parties apparently agree that Mr. Fox told Dr. West-Denning that he had

"poking pains on the [left] side, burning from the buttocks" and that he had not done a

recommended home exercise program for five months. *See, e.g.*, dkt. 1-1 at 2; dkt. 77-4 at 1. They

also agree that Dr. West-Denning declined to renew Mr. Fox's prescription for Neurontin and that

the visit was brief—no more than five minutes. *See, e.g.*, dkt. 77-1 ¶ 9; dkt. 77-24 at 89. After that,

however, the parties' descriptions of the visit vary widely.

On the day of the appointment, Dr. West-Denning provided this summary of the visit:

1. [M]usculoskeletal pain[.] Onset: 14 years ago. Duration: 24 Hours. Additional
   information: States he has "poking pains on the [left] side, burning from the
   buttocks." Reports he hasn't done the [home exercise program] in 5 months. He
   became agitated and decided to leave, called me a "bitch."

Dkt. 77-4 at 1.

---

[6] The signature is illegible, but the initials after the name clearly read "CMA." *See* dkt. 1-1 at 17.

On the same day, she completed a "Report of Conduct" form about the visit. Dkt. 77-16 at 4. She wrote: "Mr. Fox became agitated during visit, stated he was leaving. He repeatedly yelled at me before leaving & said 'bitch' on his way out." *Id.*

In her summary judgment affidavit, Dr. West-Denning described the visit as follows:

This visit was very brief, as Mr. Fox became agitated, spit on me, threatened me, and called me a "bitch" as he left the room. Because the visit terminated early, I was unable to conduct a full history and physical examination of Mr. Fox. Prior to leaving the room, Mr. Fox described poking pains on his left side, and complained of a burning sensation from the buttocks. Mr. Fox further stated that he had not done his home exercise plan in five months.

As a result of the February 12, 2018 visit, Fox was given a conduct report. Due to Mr. Fox's aggressive demeanor, the fact that he used profane language towards me, spit on me, threatened me, and further due to the size disparity between Mr. Fox and myself, I felt threatened by Mr. Fox's actions on February 12, 2018.

Dkt. 77-1 ¶¶ 9–10. She addressed her treatment decisions as follows:

Because I was unable to conduct a full history and physical assessment on February 12, 2018, and further provided that I had never previously assessed and treated Mr. Fox for his complaints of back pain, I did not renew the order for Neurontin, which was previously ordered by Dr. Byrd. In addition, based on my understanding of the applicable guidelines for prescribing non-formulary medications as well as my interpretation of appropriate medical care, in order to request a medication such as Neurontin such request would require documentation of neuropathy, specific tests to assess sensation and reflexes, and documentation of failure of multiple other medications.

Prior to February 12, 2018, when I treated Mr. Fox for diabetes, hypertension, and hyperlipidemia I could not detect any problems on Mr. Fox's history or physical exam which would allow me to prescribe Neurontin under the applicable standard of care and prescribing guidelines. Mr. Fox's back pain was controlled enough at the time of the February 12, 2018 visit for him to climb up and down off the exam table without using the provided step, for him to get off the table quickly and approach me with alacrity, and for him to bend at the waist to better scream expletives with his face mere inches from mine and spit upon me from close range, as I am much smaller than Mr. Fox and was seated at the time.

Because Mr. Fox's medical records indicated that he had not received any Neurontin medication for approximately one week, there was no medical need to provide a taper for Mr. Fox's Neurontin following the February 12, 2018, visit, as his Neurontin levels would have already decreased significantly as a result of not taking the medication.

Dkt. 77-1 ¶¶ 11–13.

At his deposition, Mr. Fox testified that Dr. West-Denning did not want to acknowledge his spondylosis at the appointment, told him he did not have spondylosis, and asked him who told him he had spondylosis.  Dkt. 77-24 at 81. He continued:

> I leaned back in the chair. The Sarge looked at me and I looked at him, and he tapped me on the shoulder. I said, Wow, ma'am, I said I see where this is headed. You can pretty much—you got a computer right there. Look everything up. Are you telling me how to do my job? No, ma'am, not at all.

> I said most doctors, no disrespect to you, usually take a history first. She didn't say nothing. I said for some reason it seemed like a problem when I talk or say something pertaining to my condition. You said I don't have spondylosis, so I'm assuming that you didn't review my medical records or anything of that nature. She said, Well, yes, I did. Okay. So you're very aware what my condition is, right?

> She said, Well, the only thing I'm worried about is your diabetes, on everything. She never said anything about no spondylosis. I said, Ma'am, you know, my medicine discontinued February 6. That's basically why we're here is to discuss to get this medicine reordered and renewed or whatever, because unfortunately it stopped.

> She said let me look. She looked. She in the computer . . . . She said, How long you had this? I said, Around 2005, '06, something like that. I can't recall right off.  She said, Who told you this was a chronic condition, and who said it was spondylosis? I just rattled off several names, Dr. Clare, Dr. Neil, Dr. Byrd, Dr. Rajoli. I just named off some doctors. I said all of these people. Physical therapy.

> Like I said, it just wasn't a good day. I felt like she was trying to really, not make me mad, but agitate me by keep asking me who is telling me this . . . . I said why was all of the other medicines reordered, but not the pain medicine? She said, I don't know. I said because, Doc, this don't make a lot of sense. All of these other conditions was pretty much, to me, stable and under control . . . . I can't control this here. This is my main focus. This is the one I need you to focus on the most. She was like, Well, we'll see if we get around to that.

*Id.* at 81–83. Mr. Fox testified that he talked about his pain, but Dr. West-Denning only wanted to discuss his diabetes. *Id.* at 82–83. According to Mr. Fox, at some point, Dr. West-Denning said, "Get him out of here," at which point officers grabbed him by the arms and pulled him out of his

chair. *Id.* at 89. He denied calling Dr. West-Denning a "bitch," but admitted he said "son of a bitch." *Id.* at 90. He denied being agitated. *Id.*

In the affidavit attached to his summary judgment response, Mr. Fox added that, at the February 12 visit, he "simply requested [his] pain medication reorder" and was "basically trying to address some other matters concerning [his] chronic care condition" and that Dr. West-Denning "clearly stated" that she did not believe he had a chronic care condition and that he was "probably faking." Dkt. 82-1 at 2. According to Mr. Fox, he then said, "Maybe you should go by the history," and Dr. West-Denning then said "something" in a disrespectful manner. *Id.* At that point, Mr. Fox said, "Don[']t disrespect me, lady." *Id.* Dr. West-Denning responded, "Stop crying," to which Mr. Fox replied, "ain't that a bitch." *Id.* At that point, Dr. West-Denning had him escorted out. *Id.* Mr. Fox emphasized that he did not decide to leave the appointment. *Id.* In his summary judgment response, which was verified, *see* dkt. 82-1 at 1, Mr. Fox denied that he was aggressive, that he screamed, and that he spit in Dr. West-Denning's face*, see* dkt. 82 at 11.

As mentioned, after the February 12 appointment, Dr. West-Denning submitted a "Report of Conduct" form related to the visit. *See* dkt. 77-16 at 4. Dr. West-Denning signed the form as the "reporting employee," and Kim Hobson—a registered nurse, employee of Wexford of Indiana, LLC, and the Health Services Administrator at WVCF—signed her name in the block labeled "Signature of immediate supervisor." *Id.*; *see also* dkt. 77-17. Mr. Fox was ultimately charged with "insolent/vulgar/profane behavior." Dkt. 77-16 at 1, 3, 4. Mr. Fox pleaded guilty to the charge. *Id.* at 1.

On February 13 and 17, 2018, Mr. Fox completed Health Care Request forms. Dkt. 1-1 at 15–16. He asked to see someone urgently for his chronic back condition and complained of serious pain after his Neurontin was discontinued. *Id.* at 15. He noted that Dr. West-Denning ended the

February 12 appointment early because she "got mad" and said that, if she was not going to reorder his pain medication, he needed to know why. *Id.* at 16. An unidentified certified medical assistant ("CMA")[7] responded by writing that, "per policy" pain is not considered a chronic care condition and Mr. Fox must see nursing sick call first. *Id.* at 15–16.

Mr. Fox completed a Health Care Request form on February 20, 2018. Dkt. 77-6. He complained of unnecessary pain in his back, legs, and buttocks. *Id.* He said he could not stand, walk, or sleep without serious pain. *Id.* He asked to be seen. *Id.* In response to the form, licensed practical nurse ("LPN") Michelle Hadley saw Mr. Fox on February 23, 2018. Dkt. 77-5 at 1–2. In her treatment note, Hadley wrote, "Seen by MD 2/12/18. Back pain was attempted to be addressed. Refer to provider note. Back exercises were provided." *Id.* at 2.

Mr. Fox completed another Health Care Request form on February 28, 2018. Dkt. 77-8. He acknowledged that he had seen the doctor on February 12 but stated that his medication had not been reordered and mentioned his chronic back condition. *Id.* In response to the form, LPN Kelly Loveall saw Mr. Fox on March 6, 2018. Dkt. 77-7. She instructed him to complete his home exercises. *Id.* She also contacted Dr. West-Denning about possible pain management options. Dkt. 77-1 ¶ 15. Dr. West-Denning recognized that Mr. Fox's medical records listed an "allergy" to ibuprofen but noted that, at the time, he was taking aspirin without issue and that aspirin is the same class of medication as ibuprofen. *Id.* ¶ 16. She also noted that Mr. Fox had been prescribed Naprosyn (also known as naproxen) at various times from 2008 to 2014 without reported symptoms. *Id.* Although she normally prefers to discuss the risks and benefits of a medication with a patient, she could not do so on February 12 because of Mr. Fox's actions. *Id.* ¶ 17. Nursing staff

---

[7] The responses appear to have been signed by the same person, but the signature is illegible, except for the initials "CMA" following the name. *See* dkt. 1-1 at 15–16.

also assured her that a discussion of the risks and benefits of naproxen took place at the March 6 nursing sick call visit. *Id.* Based on this information and the fact that naproxen is considered low enough risk to be available over-the-counter, she felt it was medically appropriate to order naproxen for Mr. Fox. *Id.* Mr. Fox testified that he told medical staff that same day that he could not take naproxen because of an allergy. Dkt. 77-24 at 104.

On April 16, 2018, Mr. Fox saw Dr. West-Denning for a chronic care visit to address his hypertension, hyperlipidemia, and diabetes. Dkt. 77-10.  Mr. Fox also wanted to discuss his back pain. *Id.* at 4. Dr. West-Denning performed a physical examination, which showed normal strength in the bilateral extremities, intact sensation in the lower extremities, and an intact gait. Dkt. 77-1 at ¶¶ 18–21; dkt. 77-10. She also performed two tests designed to determine the presence of neuropathic pain and which are required for the approval of Neurontin. *Id.* Those tests returned normal results, so she did not believe that neuropathy was significantly contributing to Mr. Fox's pain or that Neurontin was an appropriate medication. *Id.*  Instead, she prescribed Keppra. Dkt. 77-1 ¶ 22. She believed Keppra would be a suitable alternative to Neurontin given that it is an anti-epileptic during like Neurontin and that it is less trafficked than Neurontin. *Id.*

On June 2, 2018, Mr. Fox completed another form requesting health care. Dkt. 77-14. He said he was scheduled for sick call that day but could not go because of serious pain and lack of mobility. *Id.* He said that Keppra did not help his pain and only made him sleepy. *Id.* He said he was in serious pain and needed to see the doctor. *Id.* Hadley saw Mr. Fox at his cell door on June 5, 2018, and referred him to Dr. West-Denning for pain control and medication management. Dkt. 77-13. Dr. West-Denning saw Mr. Fox on June 11, 2018. Dkt. 77-15. He complained of severe pain but admitted that he could complete most activities of daily living. *Id.* Dr. West-Denning did another physical exam and again found normal strength in the bilateral extremities, intact

sensation, and intact gait.  *Id*. She again performed the tests for neuropathic pain and again found normal results. *Id.* She still did not believe that Neurontin was appropriate for Mr. Fox, but she prescribed another anti-epileptic, Trileptal, believing it to be a suitable alternative that is not subject to the level of scrutiny that requests for Neurontin get. Dkt. 77-1 ¶¶ 25–27. At the time of his deposition in May 2019, Mr. Fox was still taking Trileptal, which had been continued by Dr. Byrd. Dkt. 77-24 at 162.

## C.    Grievances and Responses

On February 20, 2018, Mr. Fox filed an informal grievance. Dkt. 77-22. He complained about the discontinuation of his Neurontin and asked why his pain medication had not been reordered, suggesting that he was suffering and could not sleep.  *Id.* Regenia Robinson—a registered nurse, employee of Wexford of Indiana, LLC, and the Director of Nursing at WVCF— responded to the informal grievance. Dkt. 77-21 ¶ 2; dkt. 77-22. To prepare her response, Robinson reviewed Mr. Fox's medical records, including the medical records generated as a result of the February 12 visit. Dkt. 77-21 ¶ 2. In her response, dated March 1, 2018, Robinson wrote, "Seen by MD on 2/12/18. MD attempted to address your complaint of back pain but you became agitated, called her a 'bitch' and left before you could be assessed. No new orders for Neurontin will be addressed until you are seen by MD." Dkt. 77-22.

On February 23, 2018, Mr. Fox filed another informal grievance. Dkt. 77-23. He said he had submitted 3 "health care forms" complaining that his pain medication had not been reordered. *Id.* He said he was in serious pain daily, could not stand/walk, had a lack of mobility, could not sleep, and needed to see a doctor urgently. *Id.* Robinson responded to this informal grievance on March 1, 2018, and directed Mr. Fox to her response to the February 20 grievance. *Id.*

The February 20 and 23 informal grievances were the first time Robinson was made aware of Mr. Fox's complaints concerning his pain medication and his February 12 visit with Dr. West-Denning. Dkt. 77-21 ¶ 4. During the time period at issue in this lawsuit, Robinson provided no direct medical care to Mr. Fox for his back pain and did not personally evaluate Mr. Fox for any of his conditions. *Id.* ¶¶ 5–6. In his first surreply, however, Mr. Fox stated that Robinson was aware of his serious medical condition before Dr. West-Denning started working at WVCF because she personally saw Mr. Fox with other doctors. Dkt. 85 at 3.

As the Director of Nursing, Robinson did not have the authority to prescribe medication; instead, her role was to ensure that offenders had access to medical care. Dkt. 77-21 ¶ 6. Based on her review of Mr. Fox's medical records, she believed he was provided with access to medical care in February 2018. *Id.* ¶ 7.

On March 8, 2018, Mr. Fox filed a formal grievance. Dkt. 77-18. He complained that Dr. West-Denning did not reorder his pain medication on February 12, 2018. *Id.* He said he was in serious pain, could not sleep, and was unable to walk due to the constant pain. *Id.* He asked to be seen or have the matter addressed immediately. *Id.* On March 12, 2018, WVCF Grievance Specialist Thomas Wellington emailed Hobson about the grievance. Dkt. 77-19. Hobson reviewed Mr. Fox's medical records and responded to the grievance on March 14, 2018. Dkt. 77-17 ¶ 4. She noted that Dr. West-Denning had observed that he was non-compliant with his exercise plan, that he terminated the last visit, and that Dr. West-Denning would not renew his pain medication without a complete assessment. Dkt. 77-20. She concluded, "If you have a medical condition you wish to be seen for submit a [health care request form] and you will be scheduled for nursing sick call." *Id.*

Wellington's March 12 email was the first time Hobson was made aware of the complaints outlined in the grievance. Dkt. 77-17 ¶ 3. During the time period at issue in this lawsuit, Hobson did not provide any direct medical care to Mr. Fox for his back condition and did not personally evaluate him for any of his medical conditions. *Id.* ¶¶ 5–6. In his first surreply, however, Mr. Fox stated that Hobson was aware of his serious medical condition before Dr. West-Denning started working at WVCF because she personally saw Mr. Fox with other doctors. Dkt. 85 at 3.

**D.    Changes to Medical Records**

In his complaint, Mr. Fox alleged that, at some unspecified point in time, Dr. West-Denning and Hobson altered his medical records. *See, e.g.*, dkt. 1 at 28.

In her summary judgment affidavit, Dr. West-Denning stated that she did not falsify or alter Mr. Fox's medical records; instead, she entered information into his medical records contemporaneously with ascertaining such information. Dkt. 77-1 ¶ 29. In her summary judgment affidavit, Hobson stated that she did not falsify of improperly alter Mr. Fox's medical records and that she has never manipulated or altered a patient's records to remove diagnoses made by doctors. Dkt. 77-17 ¶ 7. Dr. West-Denning and Hobson explained that prisoners' medical records are time-stamped and identify the individual entering the information into the system. Dkt. 77-1 ¶ 29; dkt. 77-17 ¶ 7. They stated that, should a record be added, amended, deleted, or changed it any way, there would be a time stamp associated with such action and the name of the person making the change would appear at the end of the time stamp. *Id.*

At his deposition, Mr. Fox testified that his medical records were altered to remove his diagnosis of spondylosis and to remove it as one of his chronic care conditions. Dkt. 77-24 at 133, 137–38. He testified that Hobson told him she changed his records because she did not think the

condition should be considered chronic anymore and because she did not consider spondylosis as a condition. *Id.* at 141.

In January 2019, Mr. Fox filed a grievance about Hobson's refusal to recognize spondylosis as one of his chronic care conditions. *See* dkt. 83-1 at 23–24.[8] The grievance was denied, and Mr. Fox appealed, alleging that Hobson refused to acknowledge his spondylosis as a chronic care condition in retaliation for the lawsuit he had filed against her. *Id.* After Mr. Fox's appeal, Dr. Byrd decided that spondylosis should again be listed as one of Mr. Fox's chronic care conditions. *Id.* at 23.

### III.    Discussion

### A.    Eighth Amendment Medical Care Claims

Mr. Fox asserts Eighth Amendment medical care claims against all three defendants. At all times relevant to Mr. Fox's claim, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prevail on an Eighth Amendment deliberate

---

[8] The Court cites the response to the grievance and Mr. Fox's appeal because the grievance itself does not appear to be in the record.

indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison*, 746 F.3d 766, 775 (7th Cir. 2014). "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc).

For purposes of summary judgment, the defendants concede that Mr. Fox's back pain and previous diagnosis of spondylosis constitute objectively serious medical conditions under the Eighth Amendment. Dkt. 76 at 14. They argue only that they did not display deliberate indifference to such conditions. *Id.*

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks and quoted authority omitted). "[A] refusal to treat a medical condition marked by the existence of chronic and substantial pain may give rise to an Eighth Amendment claim." *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (summarizing *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). "[A] medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far

16

afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation marks and quoted authority omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

### 1.      Dr. West-Denning

Mr. Fox contends that Dr. West-Denning's "grossly incompetent" "care and attitude" on February 12 shows evidence of intentional mistreatment and, whether or not they had a disagreement at the February 12 appointment, he should not have been in pain for more than two months until she finally examined him and prescribed Keppra. Dkt. 82 at 7–8. He also contends that Dr. West-Denning was deliberately indifferent because she prescribed naproxen to him on March 6 even though he is allergic to anti-inflammatories. *Id.* at 2.

Dr. West-Denning argues that her failure to prescribe Neurontin at the February 12 appointment was not the result of deliberate indifference, but rather was based on a medical decision not to prescribe a powerful drug without personally completing a physical examination and her belief that no taper was required after his Neurontin prescription expired. Dkt. 76 at 15–16. She emphasizes that Mr. Fox's own belligerent actions prevented her from completing the required examination, arguing, "It is difficult to imagine that a decision to forego a physical assessment of a patient who is aggressive, screaming and spitting his doctor's face, and using profanity is a substantial departure from accepted professional standards." *Id.* at 16.

The designated evidence shows there is a genuine issue of material fact as to why Dr. West-Denning did not prescribe any pain medication for Mr. Fox (whether Neurontin or something else) at or immediately after the February 12, 2018, appointment. Taking the facts in the light most favorable to Mr. Fox, as the Court must, the evidence shows that Mr. Fox had a long history of being treated for spondylosis and severe back pain while in the correctional system and had been prescribed Neurontin for that condition in 2016 and 2017 by Dr. Byrd. *See, e.g.*, Dkt. 77-4 at 2; dkt. 77-9 at 5. In August 2017, Dr. Byrd reordered the Neurontin because it was making Mr. Fox's pain manageable; that prescription was renewed in November 2017. Dkt. 77-9 at 5; dkt. 83-1 at 19. Mr. Fox's prescription for Neurontin was discontinued on February 5, 2018. Dkt. 77-9 at 5. Thereafter, Mr. Fox was scheduled for an appointment with Dr. West-Denning because he complained of "severe chronic pains" and that he needed his medication urgently because he could not sleep. Dkt. 1-1 at 17. Dr. West-Denning reviewed Mr. Fox's medical records before the February 12, 2018, appointment but refused to discuss the spondylosis condition with him, instead saying she did not believe he had a chronic care condition and was "probably faking" when he tried to talk to her about his pain and the discontinuation of the Neurontin. Dkt. 77-24 at 81–83; dkt. 82-1 at 2. Finally, when Mr. Fox told Dr. West-Denning not to disrespect him, she said, "stop crying" and then had officers forcibly remove him after he said, "ain't that a bitch" or "son of a bitch." Dkt. 82-1 at 2. Mr. Fox also denies that he was agitated and that he screamed at Dr. West-Denning or spit in her face. Dkt. 82 at 11.

A reasonable jury could infer from the designated evidence that Dr. West-Denning knew about Mr. Fox's medical history, including his pain, yet refused to treat the pain. A reasonable jury could also agree that, taken in the context of her refusal to acknowledge Mr. Fox's condition, Dr. West-Denning simply refused to treat his pain out of malice, not based on her medical judgment.

Dr. West-Denning may have had legitimate reasons based on her medical judgment for not prescribing Mr. Fox his requested drug of choice, Neurontin, but that decision would not preclude her from prescribing another medication, prescription or over the counter, to treat Mr. Fox's pain. Instead, Mr. Fox went from February 12 to March 6 with no treatment whatsoever for pain. As a result, Mr. Fox's deliberate indifference claim against Dr. West-Denning survives summary judgment. *See Gil v. Reed*, 381 F.3d 649, 661–62 (7th Cir. 2004); *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005).

Dr. West-Denning faults Mr. Fox for focusing on "the precise words" he used at the February 12 visit (that is, whether he called her a "bitch" or said "ain't that a bitch" or "son of a bitch") and the way that visit was terminated (that is, whether she ended it or he decided to leave early). Dkt. 84 at 5. She contends that these facts do not matter because, regardless of what precise profanity Mr. Fox used and why exactly the appointment ended, it is undisputed that it ended before she conducted the physical examination that she deemed necessary to support a prescription for Neurontin. *Id.* As explained, Mr. Fox disputes more than just the precise words he used at the February 12 visit and the reason the visit ended. He disputes the entire run-up to the point where Dr. West-Denning claims he "became very agitated" and has come forward with evidence from which a reasonable jury could infer that Dr. West-Denning had no intention of examining him for back pain but rather maliciously decided not to treat his back pain before the February 12 appointment even began.

Dr. West-Denning further contends that Mr. Fox is essentially complaining about a single instance of disagreement and that, when she finally did examine him two months later, she prescribed pain medications. Dkt. 84 at 6. But a single instance of refusing to treat can be enough to support a claim of deliberate indifference where, as here, there are disputed facts that if believed

by a jury are sufficient to support the inference that the refusal was a deliberate and potentially malicious act. *See Gil*, 381 F.3d at 662.

On the other hand, a jury very well may reject Mr. Fox's testimony, accept Dr. West-Denning's version of events, and determine that she was not deliberately indifferent to Mr. Fox's pain. But reaching either conclusion will require making credibility determinations and resolving contested factual issues, functions that are reserved for a jury. *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

Accordingly, Dr. West-Denning's motion for summary judgment as to Mr. Fox's Eighth Amendment deliberate indifference claim must be denied.

**2.      Director of Nursing Robinson and Health Services Administrator Hobson**

Mr. Fox contends that Robinson and Hobson were deliberately indifferent when they responded to his grievances in February and March 2018. Dkt. 1 at 7, 11. Robinson and Hobson argue that they had no personal knowledge of Mr. Fox's medical condition during the time period at issue in this lawsuit and simply relied on Dr. West-Denning's treatment notes to respond to Mr. Fox's grievances. Dkt. 76 at 19–21. Thus, they argue, Mr. Fox cannot demonstrate that they were aware of a substantial risk of harm to Mr. Fox and deliberately disregarded that risk. *Id.*

The Court agrees that Mr. Fox cannot demonstrate that Robinson and Hobson were deliberately indifferent to his serious medical needs. The crux of Mr. Fox's deliberate indifference claim is that Dr. West-Denning failed to provide appropriate medical care. Robinson and Hobson are only implicated because they did not do anything in response to Mr. Fox's complaints about Dr. West-Denning's treatment. "An inmate's correspondence to a prison administrator may…establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation." *Perez v. Fenoglio*, 792 F.3d 768, 781-82

(7th Cir. 2015) (citing *Vance v. Peters*, 97 F.3d 987, 992–93 (7th Cir. 2015)). But there is no evidence that Robinson and Hobson were aware of a serious risk to Mr. Fox. When Robinson and Hobson received grievances from Mr. Fox, they reviewed the grievances, his medical records, and responded based on their consideration of these documents. Dkt. 77-17 ¶ 4; dkt. 77-21 ¶¶ 3-4. There is no evidence that they were aware of a substantial risk of harm to Mr. Fox and disregarded that risk when they responded to his grievances in February and March 2018.

Mr. Fox does not address Robinson's and Hobson's alleged deliberate indifference in his response brief at all or dispute any of the material facts they posited for this claim, *see generally* Dkt. 82, a point Robinson and Hobson note in their reply, *see* dkt. 84 at 2–3. Mr. Fox mentions Robinson and Hobson in his first surreply, *see* dkt. 85, but he again fails to dispute any of the material facts related to his claims that they were deliberately indifferent to his serious medical needs when they responded to his grievances. Instead, he states only that Robinson and Hobson acquired some unknown knowledge about his back condition at some unknown point in time before responding to his grievances. *Id.* at 3. Even if the Court considers these unsworn factual statements from Mr. Fox's unauthorized surreply, however, Mr. Fox fails to raise a genuine issue of material fact as to whether Robinson and Hobson were aware of a serious risk of harm to Mr. Fox at the relevant time—when they responded to his grievances in February and March 2018. Accordingly, Hobson's and Robinson's requests for summary judgment on Mr. Fox's Eighth Amendment deliberate indifference claims are granted.[9]

---

[9] In his first surreply, Mr. Fox states that Robinson and Hobson were deliberately indifferent in responding to his grievances because they "deliberately, intentionally falsifie[d] cover conspired with intention to cover up wrong-doing" and that they "deliberately and intentionally falsifie[d] information[], basically conspiring with Doctor West-Denn[ing] in responding to his grievances." Dkt. 85 at 2–3. Even if the Court considers this unauthorized surreply, these speculative statements do not change the outcome because they are not sworn and, in any event, are conclusory and unsupported by any record evidence. *See Collins v. Seeman*, 462 F.3d 757, 760 n.1 (7th Cir. 2006)

B.     **First Amendment Retaliation Claims**

While the Court allowed Mr. Fox to proceed with First Amendment retaliation claims against Dr. West-Denning and Hobson, dkt. 27, the precise contours of Mr. Fox's retaliation claims against Dr. West-Denning and Robinson are not clear. In their summary judgment brief, the defendants understood Mr. Fox to be contending that: (1) Dr. West-Denning and Hobson retaliated against him by providing inadequate medical treatment, beginning with the February 12, 2018, appointment; (2) Dr. West-Denning and Hobson retaliated against him for filing grievances by altering his medical records; and (3) Dr. West-Denning and Hobson retaliated against him by including false information in the February 12, 2018, conduct report. *See* dkt. 76 at 21–25. In his response and surreplies, Mr. Fox did not dispute this characterization. *See generally* dkts. 82, 85, 88.[10] Thus, the Court limits its discussion to these alleged acts of retaliation.

To prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) a causal connection between the two." *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010) (internal quotation marks and quoted authority omitted).  Dr. West-Denning and Hobson do not contest that Mr. Fox engaged in activity protected by the First Amendment when he filed grievances in February and March 2018. Dkt. 76 at 21–25. They also do not argue that the deprivations he alleges (denied medical care, falsified conduct report, and altered medical records) would not likely deter First Amendment activity.[11]

---

(unsworn statements do not satisfy the requirements of Fed. R. Civ. P. 56); *Stagman*, 176 F.3d at 995 (conclusory statements do not satisfy Fed. R. Civ. P. 56).

[10] In his response brief, Mr. Fox has a heading that says, "The plaintiff, First Amendment-Retaliation Standard, West-Denn[ing], K. Hobson, R. Robinson," Dkt. 82 at 10, but he does not develop the argument about Robinson or cite any evidence supporting such a claim.

[11] In discussing Mr. Fox's claim that Dr. West-Denning retaliated against him by providing inadequate medical care, the defendants state in conclusory fashion that Mr. Fox has "failed to

*Id.* Instead, they focus on whether Mr. Fox's protected activity was causally connected to the allegedly retaliatory actions.

As to that element, a plaintiff must show that "the protected activity [] he engaged in was at least a motivating factor for the retaliatory action." *Archer v. Chisholm*, 870 F.3d 603, 618 (7th Cir. 2017). To "demonstrate that a defendant was motivated to retaliate based on protected speech, the plaintiff must first produce evidence that the defendant knew about the protected speech." *Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017). Suspicious timing can be evidence of a causal connection, but "a causal connection can then be demonstrated by suspicious timing alone only when the . . . action follows on the close heels of protected expressions." *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (addressing First Amendment retaliation claim in employment context). The Seventh Circuit "typically allow[s] no more than a few days to elapse" for actions to qualify as coming "on the close heels" of protected expression, although this is a "context-specific analysis with no formal legal rule." *Id.*

### 1.      Inadequate Medical Treatment

Dr. West-Denning and Robinson argue that the medical treatment Mr. Fox received was not inadequate and, even if it was, Mr. Fox's retaliation claim is still deficient because his complaints about his medical care date to February 12, 2018—which was *before* he filed any grievances related to that care. Dkt. 76 at 21–23. Moreover, they contend, Mr. Fox has not shown any causal connection between the alleged retaliation and Mr. Fox's protected speech. *Id.*

---

show that the alleged deprivation would likely deter First Amendment activity in the future." Dkt. 76 at 22. They do not develop this argument, thereby waiving it. Regardless, it is foreclosed by Seventh Circuit caselaw, which provides that "denial of medical treatment is a deprivation likely to dissuade a reasonable person from engaging in future First Amendment activity." *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015) (citing *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987)).

In response, Mr. Fox says, without citation to evidence, that Dr. West-Denning "felt it was her duty/job to punish the plaintiff Mr. Fox rather than treat him simply because of his filing prison grievance, complaint." Dkt. 82 at 6. After citing several Health Care Request forms (dated February 6, 2018, March 6, 2018, and April 16, 2018), he also states that Dr. West-Denning "simply wanted to punish[] the plaintiff instead of treating his medical need[s] on 2-12-2018." *Id.* at 14. He also states that Dr. West-Denning "had no intention to do anything on 2-12-18 because of my grievances letters et al. file on her." *Id.* at 18.

Based on Mr. Fox's response, the Court understands Mr. Fox to be relinquishing any claim of retaliation against Hobson in connection with his medical treatment and instead merely to be contending that Dr. West-Denning refused to treat him at the February 12, 2018, appointment in retaliation for grievances he had previously filed against her.[12] As Dr. West-Denning argues, however, Mr. Fox did not file a grievance about Dr. West-Denning's medical treatment until February 20, 2018—more than a week *after the* February 12 appointment. *See* Dkt. 77-22. Dr. West-Denning could not retaliate against Mr. Fox for First Amendment speech that had not yet occurred. *See, e.g.*, *Wernsing v. Thompson*, 423 F.3d 732, 752 (7th Cir. 2005) ("[P]laintiffs are actually referring to speech which has not yet occurred, which for First Amendment retaliation purposes, is no speech at all."). And, to the extent Mr. Fox contends that he filed grievances about Dr. West-Denning or engaged in other protected speech before the February 12, 2018, appointment, he has failed to produce any evidence of such grievances or other protected speech[13]

---

[12] To the extent Mr. Fox is, in fact, arguing that Hobson retaliated against him by failing to provide adequate medical care, the only action of Hobson's that could even arguably qualify as failing to provide adequate medical care is her denial of Mr. Fox's grievance about Dr. West-Denning's failure to treat him at the February 12, 2018, appointment. Mr. Fox has not pointed the Court to any evidence suggesting that Hobson was motivated in part by his protected speech.

[13] The record does include a Health Care Request form dated February 6, 2018. *See* dkt. 1-1 at 17. In the form, Mr. Fox did not complain about Dr. West-Denning (or anyone); instead, he simply

or any evidence suggesting that Dr. West-Denning knew about that speech, let alone evidence causally connecting Dr. West-Denning's actions at the February 12 appointment to that speech.

Finally, to the extent Mr. Fox bases his retaliation claim on any other medical treatment provided (or not provided) by Dr. West-Denning, there is no record evidence causally connecting Dr. West-Denning's actions to Mr. Fox's protected speech.[14] Mr. Fox does not explicitly rely on timing to make his case, but, even if he did, the most that can be said is that some of Dr. West-Denning's actions may have occurred after Mr. Fox engaged in protected speech. Here, Mr. Fox fails to show that any of the treatment decisions about which he complains came on the "close heels" of his protected speech. *See Daza*, 941 F.3d at 309.

Accordingly, Dr. West-Denning is entitled to summary judgment on this claim.

## 2. Altered Medical Records

In their summary judgment affidavits, Dr. West-Denning and Hobson denied that they altered Mr. Fox's medical records after-the-fact. Dkts. 77-1, 77-17. In their summary judgment

---

asked to be seen because his Neurontin had been discontinued and he was in pain. *Id.* It is not clear that Mr. Fox is claiming this form as protected First Amendment expression, but, even if he is, he cites no evidence suggesting a causal connection between that form and Dr. West-Denning's failure to provide treatment to him on February 12. The record also includes some grievances and complaints unrelated to the issues in this lawsuit from 2017, *see* dkt. 1-1 at 8–9, 18, 20, 23, but Mr. Fox cites no evidence showing that Dr. West-Denning knew about those complaints or that her actions on February 12 were causally connected to them.

[14] In his first surreply, Mr. Fox states that "Wexford Health Service/Wabash Valley Correctional Facility have personally custom/tacit policies/and practices they actively discriminates/retaliation, renege against the plaintiff and others who file grievances/legal actions/or a mere dissatisfaction or disagreement with facility/Wexford Health Service doctor course of treatment." Dkt. 85 at 3. The record includes no independent evidence of these claims, and Mr. Fox's unsworn statements are inadmissible to oppose summary judgment, *see, e.g.*, *Collins*, 462 F.3d at 760 n.1 (unsworn statements do not satisfy the requirements of Fed. R. Civ. P. 56). And even if the statements were sworn, the Court could not consider them because Mr. Fox does not explain how he has personal knowledge of these alleged customs, policies, or practices, reducing them to inadmissible speculation. *See Stagman*, 176 F.3d at 995; *Joseph P. Caulfield & Assocs., Inc. v. Litho Prods., Inc.*, 155 F.3d 883, 891 (7th Cir. 1998) (district court properly ignored rebuttal "evidence" based on speculation).

brief, they contend that medical records include a time stamp showing when a change was made and the name of the person who made it, and they argue that Mr. Fox's records include no notations showing that they made any after-the-fact changes. Dkt. 76 at 23. Hobson does, however, acknowledge that Mr. Fox testified at his deposition that she told him she altered his medical records. *Id.* at 23. In his response, Mr. Fox states, without citation to evidence, that his medical records were "personally changed/his spondylosis with myelopathy was deleted and [his] medical records were changed to reflect less serious medical condition" and that his records were "changed and deleted to reflect less serious condition/rather to save money, or cost-saving reasons." Dkt. 82 at 10, 11.

Dr. West-Denning's sworn statement that she never altered Mr. Fox's medical records stands unrebutted. Mr. Fox's conclusory allegations that his medical records "were altered" by some unnamed person are insufficient to counter that testimony.

Hobson also offered a sworn statement that she never altered Mr. Fox's medical records. Mr. Fox arguably rebutted this claim at his deposition by testifying that Hobson told him she altered his records because she believed his back condition no longer qualified as chronic. A reasonable jury could choose to believe Mr. Fox despite the absence of confirming notations in the medical records. However, the dispute is not material because Mr. Fox fails to show a causal connection between the alleged alteration and protected First Amendment speech. The closest he comes is the claim (stated in a January 2019 grievance, *see* Dkt. 83-1 at 23–24) that Hobson altered his medical records in retaliation for filing this lawsuit, but the record includes no evidence supporting that conclusory assertion.[15]

---

[15] Notably, Mr. Fox never specifies when his medical records were allegedly altered, eliminating even the "suspicious timing" mode of proof.  In addition, the Court notes that Mr. Fox's own response brief speculates as to a non-retaliatory motivation for altering the diagnosis—a desire to

Dr. West-Denning and Hobson are entitled to summary judgment on these claims.

**3.      Falsified Conduct Report**

Dr. West-Denning and Hobson contend that the February 12 conduct report cannot constitute retaliation because it was completed before Mr. Fox ever filed a grievance and, in any event, deny that it was "false." Dkt. 76 at 22, 24. Hobson also contends that she cannot be responsible for any allegedly false statements in the conduct report because she simply signed the report as a supervisor and did not personally attest to the truth of the allegations in the report. *Id.* at 24. In response, Mr. Fox argues that the conduct report was falsified because he never called Dr. West-Denning a "bitch" and instead said "ain't that a bitch" after Dr. West-Denning disrespected him. Dkt. 82 at 10.

Mr. Fox has failed to counter Dr. West-Denning and Hobson's argument that the conduct report could not have been retaliatory because it was completed on February 12—more than a week before Mr. Fox filed a grievance. To the extent he contends that Dr. West-Denning and Hobson used the conduct report to retaliate for some other protected First Amendment speech, he fails to identify that speech, cite any evidence showing that Dr. West-Denning and Hobson knew about the speech, or cite any evidence causally connecting the completion of the conduct report to that speech.

Dr. West-Denning and Hobson are entitled to summary judgment on these claims.

## IV.     Conclusion

For the reasons stated above, the defendants' motion for summary judgment, Dkt. [75], is

**GRANTED IN PART AND DENIED IN PART**. The motion is **granted** as to Mr. Fox's First

---

cut costs. Dkt. 82 at 11. As speculation, that statement is inadmissible, but it underscores the lack of record evidence supporting Mr. Fox's claim that Hobson altered his medical records in retaliation for protected speech.

Amendment claims against Dr. West-Denning and the First and Eighth Amendment claims against Hobson and Robinson. Those claims are **dismissed**. The motion is **denied** with respect to Mr. Fox's Eighth Amendment deliberate indifference claim against Dr. West-Denning.

Consistent with this ruling, the **clerk shall terminate** K. Hobson and R. Robinson as defendants.

The Court *sua sponte* reconsiders its denial of Mr. Fox's motion for assistance with recruiting counsel. That motion, Dkt. [44], is now **GRANTED**. The Court will now seek to recruit counsel to represent Mr. Fox for settlement and trial, if necessary. The Court will set further proceedings in a separate order.

**SO ORDERED.**

Date: 9/22/2020

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

RICHARD A. FOX
883999
WABASH VALLEY – CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel